FILED
JUL 22 2020
UNITED STATES DISTRICT COURT
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CARIANNE BOROWSKI,                          1:16-CV-999 LJV (MJR)

                    Plaintiff,              REPORT AND
                                            RECOMMENDATION

        v.

VINCENT MORDINO,

                    Defendant.


## INTRODUCTION

This case has been referred to the undersigned by the Honorable Lawrence J. Vilardo, pursuant to Section 636(b)(1) of Title 28 of the United States Code, for all pretrial matters and for hearing and reporting on dispositive motions for consideration by the District Court. (Dkt. No. 15)  Before the Court is defendant Vincent Mordino's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 63)  For the following reasons, it is recommended that defendant's motion for summary judgment be granted.

## PROCEDURAL BACKGROUND

This lawsuit arises from an incident on December 14, 2013 in Buffalo, New York, at the Peace Bridge Port of Entry between the United States and Canada, during which time plaintiff Carianne Borowski was a passenger in a vehicle stopped for inspection by defendant Vincent Mordino, a United States Customs and Border Protection Officer. Plaintiff's complaint, filed on December 13, 2016, alleges that Officer Mordino violated her constitutional rights under the First, Fourth, and Fifth Amendments and committed

common law torts against her during the course of the December 14, 2013 border stop. (Dkt. No. 1)  On March 20, 2017, defendant moved to dismiss all of the claims against him.  (Dkt. 10)  On October 19, 2017, this Court granted in part and denied in part the motion to dismiss, finding that only plaintiff's Fourth Amendment claim of excessive force against Mordino in his individual capacity could proceed.  (Dkt. Nos. 24, 26)  Following a period of discovery, defendant filed the instant motion for summary judgment.  (Dkt. Nos. 63-66)  Plaintiff filed a response (Dkt. No. 69), defendant filed a reply (Dkt. No. 70), and oral argument was heard by the Court on February 5, 2020.

## FACTS

The facts described herein are taken from the pleadings, motion papers, and exhibits filed in this lawsuit, as well as from defendant's statement of undisputed facts. All of the factual averments in defendant's statement of undisputed facts are well supported by citations to admissible evidence in the record.  (Dkt. Nos. 65, 66)  Defendant submits this evidence in the form of affidavits, exhibits, deposition testimony, and testimony provided in a related proceeding, held before the Honorable Jeremiah J. McCarthy, regarding a violation notice issued to plaintiff as a result of the events encompassing this lawsuit.  (See United States v. Carianne McHale Borowski, CVB #3402226 (March 27, 2014))  Local Rule of Civil Procedure 56 for the Western District of New York requires a party opposing a motion for summary judgment to include a response to each numbered paragraph in the moving party's statement of undisputed facts and, if necessary, additional paragraphs containing a statement of additional material facts to which the party contends there exist a genuine issue to be tried.  See Local Rule Civ. P. 56(a)(2).  In plain contravention of this Local Rule, plaintiff did not file

a response to defendant's statement of undisputed facts. Instead, plaintiff's memorandum of law references facts which plaintiff claims are material and in dispute. However, plaintiff does not cite any evidence in the record to support these statements. Further, the Court has conducted a thorough review of the record, and finds no evidence to support these assertions of disputed material fact contained in plaintiff's memorandum of law.

For these reasons, the Court deems admitted all of the facts contained in defendant's statement of undisputed facts. *See* Local Rule Civ. P. 56(a)(2) (statements of material fact by a moving party that are not specifically controverted by a correspondingly numbered paragraph in an opposing statement may be deemed admitted); *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498 (SDNY 2003) (where plaintiff's memorandum of law in opposition to summary judgment motion containing statements of facts was "of minimal helpfulness to the Court because it [was] not supported by citations to admissible evidence in the record...[the Court was] left with no choice but to treat as admitted all statements of fact contained in defendants' Rule 56.1 Statement that [were] supported and verified by admissible evidence contained in the record."); *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244, 246 (2d Cir. 2004) ("[T]he failure to respond may allow the district court to accept the movant's factual assertions as true."); *Marino v. Schult*, 764 Fed. Appx. 73, 74 (2d Cir. 2019) ("If a non-moving party fails to comply with local rules governing summary judgment, a district court may rely on a moving party's statement of undisputed facts as long as those facts are supported by the record.") Thus, in making a recommendation on the instant motion, the Court has considered all of the facts set forth in defendant's statement of undisputed

facts as well as any other evidence or testimony in the record which the Court deemed relevant.

### Officer Mordino's Position and Training

Vincent Mordino has been employed by the U.S. Customs and Border Protection ("CPB") unit of the Department of Homeland Security as a CPB officer since 2006.  (Dkt. No. 65, ¶1)  CPB officers are required to comply with the U.S. Customs and Border Protection Use of Force Policy  ("UOF Policy").  (Dkt. No. 65, ¶117; Dkt. No. 66, Exh. K) These guidelines provide that only force which is both reasonable and necessary may be used in any given situation.  (Dkt. No. 65, ¶118; Dkt. No. 66, Exh. K)  The UOF Policy contains a use of force continuum.  (Dkt. No. 65, ¶120; Dkt. No. 66, Exh. K)  The first and lowest level of force on the use of force continuum is "cooperative controls", which involve "officer presence, verbalization, and application of appropriate restraints."  (Dkt. No. 65, ¶121; Dkt. No. 66, Exh. K)  The second level of force is "contact controls", which are "physical measures taken when verbal commands and officer presence are not effective in gaining compliance [and] the subject is offering the lowest possible resistance."  (Dkt. No. 65, ¶122; Dkt. No. 66, Exh. K)  Contact controls include "strategic positioning, escort holds, joint manipulation or immobilization or touch pressure point stimulation."  (Id.)

### Circumstances Leading to the Stop

On the evening of December 14, 2013, Mordino and other CPB officers were conducting outbound border inspections of individuals and vehicles traveling from the United States to Canada at the Peace Bridge Port of Entry in Buffalo, New York.  (Dkt. No. 65, ¶2; Dkt. No. 66, Exh. A, ¶3)  The purpose of outbound inspections is to intercept the flow of narcotics, illicit currency, and individuals with outstanding warrants or possible

4

ties to terrorism, from the United States to Canada. (Dkt. No. 65, ¶3; Dkt. No. 66, Exh. B, pg. 62)  The weather on the evening of December 14, 2013 was snowy, windy and dark, with poor visibility. (Dkt. No. 65, ¶4; Dkt. No. 66, Exh. C, ¶23 and Exh. G, ¶4)

Carianne Borowski, a citizen of the United States who resides in Canada, traveled to the United States on December 14, 2013 to shop and go out to eat. (Dkt. No. 65, ¶7) She was accompanied by her husband, Matthew Borowski, and their three minor children. (Dkt. No. 65, ¶9)  Following dinner, the family intended to return to their residence in Canada. (Dkt. No. 65, ¶8; Dkt. No. 66, ¶5)  Mr. Borowski was driving a 2007 Subaru Impreza with an Ontario license plate, and Mrs. Borowski was seated in the front passenger seat. (Dkt. No. 65, ¶9)  The three children, including a five-month old infant boy strapped into a car seat, were seated in the backseat of the vehicle. (*Id.*)  As the family drove toward the Peace Bride Port of Entry, the infant began crying. (Dkt. No. 66, Exh. G, ¶6)  Mrs. Borowski asked Mr. Borowski to pull the car over into the parking lot of the Peace Bridge Duty Free store, so that she could attend to the baby before they crossed the bridge into Canada. (*Id.*)  As they approached the entrance to the Peace Bridge Duty Free store, Mr. Borowski observed cones blocking the entrance to the parking lot. (Dkt. No. 66, Exh. G, ¶8)  Officer Mordino was standing on the side of the roadway. (*Id.*)  Officer Mordino motioned for Mr. Borowski to pull over the vehicle over for inspection, which he did. (Dkt. No. 66, Exh. G, ¶¶8-9 and Exh. A, ¶4)

*Initial Stop*

Officer Mordino approached the front driver's side of the Impreza and asked Mr. Borowski for the vehicle's registration. (Dkt. No. 65, ¶¶14-15; Dkt. No. 66, Exh. A, ¶5)  In response, Mr. Borowski asked Officer Mordino to identify himself and to explain why he

stopped the vehicle.  (Dkt. No. 65, ¶¶14-15; Dkt. No. 66, Exh. B)  Mr. Borowski also

questioned whether Officer Mordino had probable cause for the stop, since the family was

exiting the United States rather than seeking permission to enter.  (Dkt. No. 65, ¶¶¶14-15;

Dkt. No. 66, Exh. C)  It was taking some time for Mr. Borowski to locate the registration,

and traffic was beginning to line-up behind his vehicle.  (Dkt. No. 65, ¶20; Dkt. No. 66,

Exh. A, ¶¶6-7)  Thus, Officer Mordino instructed Mr. Borowski to pull off the roadway to a

separate area where secondary inspections are conducted.  (Id.; Dkt. No. 66, Exh. G,

¶13)  Mr. Borowski drove to the secondary inspection area and Officer Mordino followed

on foot.  (Dkt. No. 65, ¶22; Dkt. No. 66, Exh. A, ¶8)  At no time during the initial stop did

Mrs. Borowski inform Officer Mordino that she wanted to exit the vehicle to attend to any

of the minor children, including the infant.  (Dkt. No. 65, ¶21; Dkt. No. 66, Exh. C, pg. 36)

Incident at the Secondary Inspection Area

When the Impreza arrived at the secondary inspection area, Officer Mordino

approached the front driver's side of vehicle and again asked Mr. Borowski for the

vehicle's registration.  (Dkt. No. 65, ¶32; Dkt. No. 66, Exh. A, ¶9)  At that time, Mrs.

Borowski abruptly exited the front passenger door of the vehicle and walked toward the

rear passenger door.  (Dkt. No. 65, ¶32; Dkt. No. 66, Exh. A, ¶9 and Exh. F, ¶7)  Prior to

exiting the vehicle, Mrs. Borowski did not ask for permission to exit the vehicle nor did

she inform Officer Mordino that she intended to exit the vehicle before doing so.  (Dkt.

No. 65, ¶27-30)  Further, Mr. Borowski did not indicate that his wife wanted to exit the

vehicle.  (Dkt. No. 65, ¶29)  Upon seeing Mrs. Borowski exit the vehicle, Officer Mordino

instructed her to get back inside.  (Dkt. 65, ¶34; Dkt. No. 66, Exh. A, ¶10 and Exh. F, ¶9)

Specifically, he looked directly at Mrs. Borowski and yelled several times "get back in the

6

car" while repeatedly pointing his flashlight directly at her while motioning toward the front seat. (Dkt. No. 65, ¶35)  Mrs. Borowski did not return to the front passenger seat as instructed, but instead continued toward the rear passenger side, eventually opening the rear passenger door of the vehicle and reaching her upper body and arms into the back seat. (Dkt. No. 65, ¶¶43-45; Dkt. No. 66, Exh. F, ¶¶11-14)  In response, Officer Mordino walked from the front driver's side of the vehicle to the rear passenger side of the vehicle, while continuing to point his flashlight at Mrs. Borowski and commanding her to get back into the vehicle. (Dkt. No. 65, ¶¶45-47; Dkt. No. 66, Exh. F, ¶¶17-18)  She did not comply, but instead continued to reach into the vehicle. (*Id.*)  Upon arriving at the rear passenger door, Officer Mordino reached inside the vehicle and tapped Mrs. Borowski on the shoulder. (Dkt. No. 65, ¶64; Dkt. No. 66, Exh. A)  He again told her to get back into the vehicle, and again she did not comply. (Dkt. No. 65, ¶64-69; Dkt. No. 66, Exh. F, ¶22)  Officer Mordino then placed his hand on Mrs. Borowski's shoulder to guide her away from the backseat. (*Id.*; Dkt. No. 66, Exh. A, ¶14)  Mrs. Borowski pulled away from him. (Dkt No. 65, ¶¶70-71)  In response, Officer Mordino grasped her left shoulder and right arm and pulled her upper body fully outside of the vehicle. (Dkt No. 65, ¶73)  She never fell to the ground, and she remained in a standing position. (Dkt. No. 66, Exh. E, pg. 51)  Once fully outside, Mrs. Borowski immediately stood erect and placed her hands on the exterior of the vehicle. (Dkt No. 65, ¶75; Dkt. No. 66, Exh. F, ¶25)

Officer Mordino then secured Mrs. Borowski's hands, and another officer handcuffed her. (Dkt. No. 65, ¶¶78-79; Dkt. No. 66, Exh. A, ¶17)  Mrs. Borowski did not resist the handcuffing, and there was nothing unusual in the manner she was handcuffed. (Dkt. No. 65, ¶77; Dkt. No. 66, Exh. B)  Mrs. Borowski was then placed in a CPB vehicle

7

and taken to a secondary inspection building.[1]  (Dkt No. 65, ¶82; Dkt. No. 66, Exh. A, ¶18)  She was issued a violation notice for failing to obey Officer Mordino's instructions and was permitted to leave the Peace Bridge Port of Entry to return home that evening.[2]  (Dkt. No. 65, ¶84; Dkt. No. 66, Exh. H, ¶9)

### Officer Mordino's Description of the Incident

Officer Mordino indicates that when he ordered the Impreza to secondary inspection, none of the children in the backseat were crying.  (Dkt. No. 66, Exh. B, pg. 49)  Further, when Mrs. Borowski exited the Impreza, he did not know why she left the vehicle or what she intended to do.  (Dkt. No. 65, ¶34; Dkt. No. 66, Exh. A, ¶10 and Exh. F, ¶9)  Officer Mordino further explains that when Mrs. Borowski moved abruptly for an unknown reason, he became concerned for his own safety and the safety of other officers. (Dkt. No. 66, Exh. A, ¶10 and Exh. B, pg. 20)  Officer Mordino indicates that he yelled several times at Mrs. Borowski to return to the vehicle, and she mumbled something to the effect of "I'm not getting in the car."  (Dkt. No. 66, Exh. B, pg. 21 and Exh. F, ¶11)  He became further concerned because not only was Mrs. Borowski disobeying his orders, but he was

---

[1] A surveillance video taken on December 14, 2013 at the secondary inspection area of the Peace Bridge Port of Entry was submitted as an exhibit to defendant's motion for summary judgment.  (Dkt. No. 66, Exh. D)  The video includes visual footage from the time the Impreza pulls into the secondary inspection area through the time Mrs. Borowski is handcuffed and escorted to a nearby CBP vehicle.  The video does not include audio.  The Court has reviewed the video and finds it to be consistent with the events as described herein.  Specifically, Officer Mordino can be seen approaching the driver side of the vehicle at which time Mrs. Borowski exits the passenger side.  Officer Mordino then turns his attention to Mrs. Borowski and begins to repeatedly waive his flashlight at her and motion back to the vehicle.  Mrs. Borowski opens the back passenger door and leans into the vehicle, and Officer Mordino walks around the car to her location.  Officer Mordino appears to tap Mrs. Borowski on the shoulder, and she continues to lean forward into the vehicle.  Officer Mordino then appears to reach in and pull her upper body from the inside of the car.

[2] The violation charge was later dismissed by United States Magistrate Judge Jeremiah J. McCarthy, who found that given the weather conditions, the vehicular noise at the time of the incident, and his review of the video, it appeared that Mrs. Borowski was intent on aiding her child in the backseat and may not have heard Officer Mordino's instructions.  (Dkt. No. 66, Exh. I)

unable see her hands or the rear passenger floor of the vehicle where she was reaching. (Dkt. No. 66, Exh. A, ¶12 Dkt. No. 66, Exh. F, ¶18)  Officer Mordino explains that in these types of situations, his primary focus is "controlling hands and controlling the situation" and "if someone fails to follow an order, well, then it heightens the concern if they're not about to listen to a simple order, you don't know what's next." (Dkt. No. 66, Exh. B, pg. 21)

Officer Mordino explains that after Mrs. Borowski failed to respond to his multiple demands to get back into the car, he "worked [his] way around the vehicle to…make contact with her." (Dkt. No. 66, Exh. B, pgs. 21-23)  When he approached, he gave Mrs. Borowski another chance to comply by tapping her on the shoulder.  (*Id.*)  When she "shrugged him off", Officer Mordino set his light down, grabbed her shoulder and arm, and pulled her outside of the vehicle.  (*Id.*)  After another officer placed the handcuffs on Mrs. Borowski, Officer Mordino walk her to a nearby CPB vehicle.  (Dkt. No. 66, Exh. A, ¶19)  Officer Mordino did not have any further contact with Mrs. Borowski.  (*Id.*)

### *Mrs. Borowski's Description of the Incident*

Mrs. Borowski indicates that when she exited the vehicle at the second inspection area, she intended to take her infant son out of his car seat and bring him to the front to stop him from crying.  (Dkt. No. 66, Exh. E, pg. 40)  She admits that she did not ask for permission to leave the vehicle.  (Dkt. No. 65, ¶30; Dkt. No. 66, Exh. E, pg. 27)  She further indicates that when she exited the vehicle, she did not hear Officer Mordino telling her to get back in the car, nor did she see him waiving his flashlight in her direction and motioning to the car.  (Dkt. No. 66, Exh. E, pgs. 38-39)  She maintains that it was loud due to the wind and noise from the traffic, and that she heard Officer Mordino tell her to

get back inside the vehicle only once, right before he grabbed her shoulder. (Dkt. No. 66, Exh. E, pg. 40) She indicates that she pulled away from Officer Mordino when he made physical contact with her because she had begun to take the baby out of his car seat, and was afraid she might drop him. (Dkt. No. 66, Exh. E, pgs. 41-42; Dkt. No. 66, Exh. B, pg. 90) She claims that if she had heard Officer Mordino's prior commands to get back in the car before having her hands on the baby, she would have complied. (Dkt. No. 66, Exh. B, pg. 90) Mrs. Borowski further states that because it was dark and the vehicle is small, it would not have been possible for Officer Mordino see into the floor of the Impreza's rear passenger seat. (Dkt. No. 66, Exh. E, pg. 43) Mrs. Borowski indicates that after being handcuffed, an unidentified officer leaned into her with his body weight. (Dkt. No. 66, Exh. E, pg. 51)

_Mr. Borowski's Testimony_

Mr. Borowski indicates that Officer Mordino was asking him about his vehicle registration when he heard Mordino suddenly yell "get back in the car", and then start walking to the other side of the vehicle. (Dkt. No. 66, Exh. C, pg. 51) Mr. Borowski looked over and saw his wife standing outside of the rear passenger door, unbuckling the baby from the car seat. (_Id._) He indicates that it was extremely noisy as a result of the wind and traffic, and that he could not hear anything that was happening outside of the vehicle. (Dkt. No. 66, Exh. C, pgs. 51-52) Mr. Borowski also indicates that he remembers Officer Mordino telling Mrs. Borowski once or twice to get back in the vehicle, but he does not believe she would have been able to hear the commands over the background noise. (Dkt. No. 66, Exh. C, pg. 53) Mr. Borowski also indicates that he does not believe Mrs.

Borowski would have had time to comply with Officer Mordino's directive before she was physically pulled from the car. (*Id.*)

### *Alleged Injuries and Medical Treatment*

Mrs. Borowski claims that her back was forcefully grabbed and that her arm was "yanked back" two or three times when she was taken out of the vehicle and handcuffed. (Dkt. No. 66, Exh. E, pgs. 41, 47)  She also claims that when she was transported in the CPB vehicle after the incident, her wrist was in severe pain because the handcuffs were too tight.  (Dkt. No. 66, Exh, E, pg. 46)  However, at no time on December 14, 2013 did Mrs. Borowski complain to any CPB officers that the handcuffs were too tight, nor did she complain of any pain, discomfort or injury.  (Dkt. No. 65, ¶89; Dkt. No. 66, Exh. E, pg. 55)

Mrs. Borowski did not seek medical treatment that evening, but presented at the emergency room of a Welland, Ontario hospital the next day complaining of pain in her back, arms and wrist.  (Dkt. No. 66, Exh. E, pg. 56, 59)  She suffered no cuts or lacerations.  (Dkt. No. 66, Exh. E, pg. 57)  She claims she had a bruise on her wrist after the incident, but no bruising is reflected on her medical records.  (Dkt. No. 65, ¶94; Dkt. No. 66, Exh. E, pg. 56-57)  Mrs. Borowski indicates that the emergency room doctor offered to prescribe pain medication and she declined.  (Dkt. No. 66, Exh. E, pg. 59-60)  No treatment was rendered at the emergency room, and she did not follow-up with her own physician.  (Dkt. No. 66, Exh. E, pgs. 60-61, Exh. J)  Mrs. Borowski states that she took Ibuprofren for the first two or three days after the incident.  (*Id.*)  She claims that her arms and back were in pain for approximately three weeks, and that the pain later subsided.  (*Id.*)

## DISCUSSION

### *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56.  A genuine issue of material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazine, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991); *see also Matsushia Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (summary judgment is appropriate when "the record as a whole could not lead a rational trier of fact to find for the non-moving party").  When a movant has met this burden, the burden shifts to the non-movant to bring forth evidence establishing the existence of an issue of material fact. *Linares v. McLaughlin*, 423 Fed. Appx. 84, 86 (2d Cir. 2011); *see also Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2007) (an issue of fact is considered "material" if it "might affect the outcome of the suit under the governing law").

In evaluating a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it is the burden of the moving party to demonstrate the absence of any material genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988).  Importantly, a court must not "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact."

Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995). However, a party cannot defeat a motion for summary judgment by relying upon conclusory statements or mere allegations. Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). See e.g., Gottlieb v. County of Orange, 84 F.3d 511, 519 (2d Cir. 1996) (opposing party cannot defeat summary judgment motion by "relying on the allegations in his pleading…or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.")

### Plaintiff's Removal from Vehicle

In order to establish a constitutional violation based upon the use of excessive force, a plaintiff must demonstrate that the force used by a police officer was "objectively unreasonable" under Fourth Amendment standards and in light of the facts and circumstances surrounding the officer at the time of the incident. Finnegan v. Fountain, 915 F.2d 817 (2d Cir. 1990). The reasonableness of the force is "judged from the perspective of a reasonable officer on the scene" and takes into account factors such as the severity of conduct at issue, whether the individual poses an immediate threat to the safety of the officers or others, and whether the individual was actively resisting. Id. See also Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000). The Supreme Court has noted that the "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision or hindsight." Graham v. Connor, 490 U.S. 386, 395 (1989). In making a reasonableness determination, courts must consider the fact that "law enforcement officers are often forced to make quick decisions under stressful and rapidly evolving circumstances rendering the calculation of what amount of force is reasonable difficult." Wierzbic v. Howard, 331 F.R.D. 32, 59 (WDNY 2019); accord Graham, 490 U.S. at 396.

Further, a plaintiff does not have to suffer serious or significant injury to support a claim of excessive force. *See United States v. Walsh*, 194 F.3d 37. 50 (2d Cir. 1999). However, the amount of force used must be more than *de minimis*. *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999); *see also Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) ("a *de minimis* use of force will rarely suffice to state a constitutional claim"); *Washpon v. Parr*, 561 F. Supp. 2d 394 (SDNY 2008) (*de minimis* injury can serve as conclusive evidence that *de minimis* force was used).

Considering the undisputed facts in the light most favorable to plaintiff, the Court finds that Officer Mordino's actions on December 14, 2013 were objectively reasonable under the circumstances, and that no reasonable juror could conclude otherwise. It is undisputed that during a routine vehicle inspection stop by Officer Mordino at an international border, Mrs. Borowski abruptly exited her vehicle without warning. It is also undisputed that Officer Mordino repeatedly told Mrs. Borowski to get back in the vehicle, but she did not do so. It is undisputed that Mrs. Borowski heard Officer Mordino direct her to return to the vehicle immediately prior to him making physical contact with her. It is undisputed that he used "cooperation controls" consistent with his training, such as officer presence, waiving his flashlight, and tapping her shoulder in order to gain compliance. It is also undisputed that Mrs. Borowski pulled away from Officer Mordino when he placed his hand on her shoulder to guide her away from the car. It is undisputed that Officer Mordino was unable see what she was doing or what was happening inside

the car.[3]  The evidence in the record further reflects that when Mrs. Borowski ignored his

commands, Officer Mordino was concerned for the safety of himself and other officers.

In fact, his training instructs him to be on alert when (1) an individual moves abruptly, (2)

an individual fails to follow his commands, and (3) he cannot see or control an individual's

hands.  The totality of these circumstances, considered in light of the fact that Officer

Mordino had to make a split-second decision as to how to address Mrs. Borowski's

repeated noncompliance and his own safety concerns, justified the minimal amount of

force used to grasp Mrs. Borowski's arm and shoulder and pull her out of the car, and

then secure her hands.  *See Elnicki v. City of Rutland*, 2:17-CV-00048, 2019 U.S. Dist.

LEXIS 3051, *16 (D. Vt. Jan. 8, 2019) (officer's actions in grabbing plaintiff's arm after

plaintiff refused to comply with officer's request to exit a vehicle were objectively

reasonable since "minor escalation in force [is] objectively reasonable in light of clear

evidence that a mere verbal command would not suffice"); *Othman v. City of New York*,

13-CV-4771, 2018 U.S. Dist. LEXIS 59967 (EDNY Mar. 31, 2018) (where plaintiff

"evidences an unwillingness to exit his vehicle after being requested to do so by a police

officer, the officer may have cause to forcibly remove [plaintiff] from his vehicle").

Mrs. Borowski offered testimony that she did not hear Officer Mordino's initial

commands, and that she did not have time to comply with his final directive before he

grabbed her.  These statements, accepted as true, do not create a material issue of fact.

All of the credible evidence in the record proves that Officer Mordino did in fact tell Mrs.

---

[3] Plaintiff speculates that Officer Mordino could see in the backseat and would have known that there was nothing threatening inside.  There is no evidence in the record to support this assertion.  In fact, the credible evidence in the record proves the opposite.  Officer Mordino testified that he could not see in the backseat of the car and plaintiff herself testified that because it was dark and the car is small, Officer Mordino would not have been able to see the floor of the back-passenger seat.

Borowski, on multiple occasions, to get back in the vehicle before making physical contact with her.  Officer Mordino testified to this effect, and his testimony is corroborated by the video of the incident.  Although the video does not contain an audio recording, it shows Officer Mordino immediately turn his attention to Mrs. Borowski when she exits the vehicle, and then proceed to emphatically and repeatedly waive his flashlight back and forth between her and the Impreza.  The video also shows Mrs. Borowski appear to ignore or turn away from Officer Mordino and instead reach her upper body and arms into the back passenger seat.  Thus, regardless of what commands Mrs. Borowski heard or when she heard them, the undisputed evidence shows that it was apparent to Officer Mordino that Mrs. Borowski was not going to return to the front seat of the car on her own accord, despite his repeated directives that she do so.

Plaintiff further contends that Officer Mordino's decision to use force when Mrs. Borowski failed to comply with his verbal orders was unreasonable because Mordino had no reason to fear for his safety.  Plaintiff speculates that Officer Mordino must have known that Mrs. Borowski was not dangerous, and that she was merely attending to her infant child in the backseat.  However, there is no evidence in the record to support this statement.  In fact, Officer Mordino testified that none of the children were crying during the initial stop, and the undisputed testimony from all of the witnesses, including plaintiff herself, indicates that Mrs. Borowski did not ask permission or explain what she was doing before abruptly exiting the vehicle.  Furthermore, the evidence in the record reflects that Officer Mordino had a genuine and reasonable concern for his own safety and the safety of the other officers because: (1) Mrs. Borowski was not complying with his orders; (2) he could not see her hands; and (3) he did not know why she was reaching into the backseat

16

or what was located there.  Plaintiff offers no evidence or testimony to refute these facts.

Moreover, Mrs. Borowski's actual intent is irrelevant, since "an officer's reasonable but

mistaken belief about the threat a suspect poses can justify the use of force

notwithstanding the suspect's subjective intent." *Scott v. City of Rochester*, 17-CV-6311,

2019 U.S. Dist. LEXIS 144452 (WDNY Aug. 23, 2019) ("a potential suspect's subjective

intentions do not govern use of force analysis"); *accord Stephenson v. Doe*, 332 F.3d 68,

78-79 (2d Cir. 2003).  *See also Pearson v. Callahan*, 555 U.S. 223 (2009) ("If an officer

reasonably, but mistakenly, believed that a suspect was likely to fight back...the officer

would be justified in using more than in fact was needed.").

Plaintiff also argues that Officer Mordino's actions were unreasonable because

they occurred during a border stop as opposed to during a traffic stop.  The Court finds

this distinction to be irrelevant.  Routine stops and searches of individuals at an

international border may be conducted without any individualized requirement of

reasonable suspicion or probable cause.  *See United States v. Montoya de Hernandez*,

473 U.S. 531, 538 (1985); *United States v. Maigar*, 568 F.Supp.2d 245 (NDNY 2008)

(motion to suppress evidence discovered during search of car traveling from the United

States to Canada denied since a customs official may stop and search, at a border and

without a search warrant, any vehicle entering or departing from the United States).  On

December 14, 2013, Officer Mordino was tasked with conducting inspections of outbound

vehicles at the border between the United States and Canada.  He was acting within the

bounds of the Fourth Amendment when he stopped the Impreza for routine inspection

and asked its driver for the vehicle's registration.  By extension, Officer Mordino could

expect that the vehicle occupants would obey his directives, and he was permitted to take

reasonable steps to effectuate compliance should that not occur, just as he would be permitted to do during a traffic stop.[4] In fact, law enforcement officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the *status quo* during the course of a stop." *Davila v. United States*, 713 F.3d 248, 259-60 (5th Cir. 2013) (*quoting United States v. Hensley*, 469 U.S. 221, 235 (1985)).

The Court further finds that no reasonable juror could conclude that Officer Mordino's actions were objectively unreasonable because the undisputed evidence proves that the amount of force used by Officer Mordino was *de minimis* at best. Here, the undisputed facts show that Officer Mordino tapped Mrs. Borowski on the shoulder, she pulled away, and he then grasped her shoulder and arm and pulled her upper body out of the vehicle. She never fell to the ground and she remained upright throughout the brief encounter. Once outside of the car, she immediately stood erect and placed her hands on the car. According to plaintiff, her arm was "yanked back" and her back was forcefully grabbed. Crediting plaintiff's description of the force used by Officer Mordino, it remains plainly insufficient to give rise to a violation of her Fourth Amendment rights, considering the surrounding circumstances. In fact, the very minimal amount of force used did not exceed what was needed to remove Mrs. Borowski from the car and secure her hands, in order to ensure that she was not a danger to Officer Mordino or the other

---

[4] Plaintiff also contends that Officer Mordino's actions were unreasonable because occupants are "routinely" able or expected to exit their vehicles during secondary inspection. First, there is no evidence in the record to support this statement. Further, the actual evidence here shows exactly the opposite, namely, that Mrs. Borowski was repeatedly told to get back inside her vehicle.

officers present.[5]  *See Feliciano v. Thomann*, 747 Fed. Appx. 885, 887 (2d Cir. 2019) (to establish an excessive force claim, plaintiff must show that defendant used more than *de minimis* force); *Davenport v. County of Suffolk*, 99-CV-3088, 2007 U.S. Dist. LEXIS 12696 (EDNY Feb. 23, 2007) (recognizing that "there may be certain circumstances where the alleged constitutional act and injury are so *de minimis* that it cannot rise to a constitutional violation as a matter of law."); *Morgan v. Nassau County*, 03-CV-5109, 2009 U.S. Dist. LEXIS 79180 (EDNY Sept. 1, 2009) (plaintiff's excessive force claim dismissed where "use of force as articulated by [p]laintiff...is *de minimis* and cannot be described as excessive, injurious or unreasonable."); *Azor v. City of New York*, 08 CV 04473, 2012 U.S. Dist. LEXIS 47067 (EDNY Mar. 30, 2012) (plaintiff failed to state an excessive force claim where defendants' "rough push" and "grab" were minimal and a reasonable use of force during a pat down to ensure plaintiff was not armed.).

The injuries claimed by plaintiff also support a finding that the force used was no more than *de minimis*.  Mrs. Borowski did not seek any medical treatment the night of the incident, nor did she complain to any CBP officers of injury or pain.  During a hospital visit the next day, she reported pain in her back, arm, and wrist.  She also reported a bruise on her wrist that was not reflected in the medical records.  She had no cuts or lacerations. She did not undergo X-rays, CT scans, or MRI's.  She refused prescription pain

---

[5] The video shows plaintiff being pulled from the car by Officer Mordino.  (Dkt. No. 66, Exh. D)  However, because the incident occurred at night during a snowstorm, the video is dark and somewhat "grainy".  In addition, the video is taken from some distance away.  Due to the body position of Mordino and the other officers, some portions of the incident cannot be fully viewed.  Thus, the testimony described herein provides a more accurate account as to the amount of force used, and the Court has primarily relied on the testimony of Officer Mordino and Mrs. Borowski in reaching the determinations set forth herein. However, the Court notes that, from what can be viewed in the video, it took Officer Mordino only seconds to reach in and remove Mrs. Borowski from the vehicle and she remains standing upright the entire time. Further, Officer Mordino does not appear to use any more force than what is needed to pull her upper body from the car and secure her hands.

medication, and pursued no further medical treatment. Mrs. Borowski testified that she took Ibuprofen for a couple of days and that the pain subsided within a few weeks. She continued to engage in her normal activities. The fact that Mrs. Borowski suffered no appreciable injury from the incident other than some temporary pain and a single bruise, combined with the evidence in the record as to the minimal amount of force actually used in removing her from the car, proves that the force used by Officer Mordino on December 13, 2014 was *de minimis*. *See Yang Feng Zhao v. City of N.Y.*, 656 F. Supp. 2d 375, 390 (SDNY 2009) (noting that "the extent and nature of the injury, if any, is typically relevant in an arrest context…because it is probative of the amount and type of force actually used by the arresting officers and that in turn is likely to reflect on the reasonableness of that force"); *Rolkiewicz v. City of New York*, 1:16-CV-06771, 2020 U.S. Dist. LEXIS 36966, *15 (SDNY Mar. 3, 2020) (*de minimis* injuries may be probative of the amount of force actually used by the officer); *Lemmo v. McKoy*, 08-CV-4264, 2011 U.S. Dist. LEXIS 23075 (EDNY Mar. 8, 2011) (noting that some injuries held to be *de minimis* for purposes of defeating excessive force claim include short term pain, swelling, and bruising); *Wims v. New York City Police Dep't*, 10 Civ. 6128, 2011 U.S. Dist. LEXIS 78641 (SDNY July 20, 2011) (excessive force allegations dismissed where allegations of having been "thrown flat on [his] face on the filthy ground" did not result in an appreciable injury and did rise to a level of force that was more than *de minimis*).

For all of these reasons, the Court finds that defendant is entitled to summary judgment because the undisputed facts demonstrate that his actions in removing plaintiff from her vehicle on December 14, 2013 were objectively reasonable under the circumstances.

*Handcuffing*

While excessively tight handcuffing may constitute a Fourth Amendment violation, "[c]ourts apply a separate standard to claims for excessive force in the use of handcuffs." *Sachs v. Cantwell*, 10 Civ. 1663, 2012 U.S. Dist. LEXIS 125335 (SDNY Sept. 4, 2012). In assessing an excessive force claim arising from handcuffing, courts consider: (1) evidence that the handcuffs were unreasonably tight; (2) evidence that defendants ignored plaintiff's pleas that the handcuffs were too tight; and (3) the degree of injury to the wrist. *Sroka v. Welcher*, 13-CV-190, 2016 U.S. Dist. LEXIS 7835, *16 (WDNY Jan. 6, 2016). The injury requirement is "particularly important." *Morocho v. City of New York*, 13-CV-4585, 2015 U.S. Dist. LEXIS 100527 (SDNY July 31, 2015). "There is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (SDNY 2008). "The most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage." *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575 (SDNY 2013).

Here, Mrs. Borowski did not complain to Officer Mordino or any CPB officers that the handcuffs were too tight. Officer Mordino testified that there was nothing unusual or out of the ordinary in the manner plaintiff was handcuffed, and the record is devoid of evidence that the handcuffs were unreasonably tight. The only injuries plaintiff claims to have suffered related to the handcuffing are temporary pain and a bruise on her wrist.[6] Even if taken as true, these facts are insufficient, as a matter of law, to maintain a Fourth

---

[6] Plaintiff testified that in the course of being handcuffed, an unidentified officer leaned against her, and that her stomach, thighs and chest area made contact with the vehicle. However, plaintiff did not report pain in any of those areas when she visited the hospital the next day, and her medical records reflect no injuries whatsoever to those areas of her body. (Dkt. No. 65, ¶104; Dkt. No. 66, Exh. J)

Amendment claim for excessively tight handcuffing. *See Selvaggio v. Patterson,* 93 F. Supp. 3d 54 (EDNY 2015) (abrasions and scabbing that lasted approximately one week were insufficient to meet the injury requirement for excessive force in handcuffing); *Bratton v. N.Y. State Div. of Parole,* 05-CV-50, 2008 U.S. Dist. LEXIS 30250 (NDNY April 14, 2008) (granting summary judgment to the defendants where medical records indicated that the plaintiff suffered from continuing swelling and bruising due to handcuffs); *Faruki v. City of New York,* 10 Civ. 9614, 2012 U.S. Dist. LEXIS 47310 (SDNY Mar. 30, 2012) (bruising of the wrists, redness and swelling that healed within two weeks of the arrest are insufficient to support a constitutional claim for excessively tight handcuffing); *Jackson v. City of New York,* 939 F. Supp. 2d 219, 231 (EDNY 2013) ("injuries held to be *de minimis* for purposes of defeating excessive force claims include short-term pain, swelling, and bruising and brief numbness from handcuffing"); *Richardson v. N.Y.C. Health & Hosns, Corp.,* 05-CV-6278, 2009 U.S. Dist. LEXIS 25247 (SDNY Mar. 25, 2009) (granting summary judgment where plaintiff experienced pain, bruises, swelling, and red marks, and was given an over-the-counter pain reliever at the hospital, because injury was insufficient to permit a jury to conclude that the handcuffing had involved an unreasonable use of force).

For these reasons, the Court finds that summary judgment should be granted in favor of defendant as to plaintiff's claim of excessive force in handcuffing.

### *Qualified Immunity*

Lastly, even if a Fourth Amendment violation had occurred, which it did not, Officer Mordino's conduct on December 14, 2013 is protected by qualified immunity. The doctrine of qualified immunity "shields government officials from civil damages liability

unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). Officials are entitled to qualified immunity when "their decision was reasonable even if mistaken" and "the doctrine gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal citations omitted). In order to establish a defense of qualified immunity, a police officer must satisfy one of two tests: (1) that his or her conduct did not violate "clearly established rights" of which a reasonable person would have known; or (2) that it was "objectively reasonable to believe that his or her acts did not violate these clearly established rights." *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990) A defendant is entitled to summary judgment on qualified immunity grounds when "no reasonable jury, looking at the evidence in the light most favorable to, the plaintiff, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Robinson v. Via*, 821 F.2d 913, 921 (2d Cir. 1987); *Thomas v. Roach*, 165 F.3d 137 (2d Cir. 1998) (the officers had qualified immunity only if it were objectively reasonable for them to believe that their conduct did not violate the Fourth Amendment).

Here, the undisputed facts show, that during his encounter with Mrs. Borowski, Officer Mordino first used "cooperation controls" consistent with his use of force training. These included (1) officer presence, (2) repeated verbal commands, and (3) a waiving of his flashlight. When those were not successful, and in accordance with his use of force training, he attempted a contact control by placing a hand on Mrs. Borowski's shoulder to guide her away from the backseat. When she resisted, he employed a minimal amount

of force to pull her upper body from the car and assist in handcuffing her, to ensure she was not a danger to himself and other officers. In light of these circumstances, and taking into account the minor amount of force involved, the Court finds that it was not objectively unreasonable for Officer Mordino to believe that the force used did not violate plaintiff's Fourth Amendment rights. Likewise, no rational jury could find that the force used here was so excessive that no reasonable officer would have made the same choice.[7] For these reasons, Officer Mordino is also entitled to qualified immunity with respect to the instant Fourth Amendment claims.

## CONCLUSION

For the foregoing reasons, the Court recommends that defendant Vincent Mordino's motion for summary judgment (Dkt. No. 63) be granted, and that plaintiff Carianne Borowski's complaint be dismissed.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Vilardo,

---

[7] The Court notes that Officer Mordino would also be entitled to qualified immunity based on the fact that his conduct did not violate a clearly established right of which a reasonable person would have known. A principle is "clearly established" if it has "a sufficiently clear foundation in then existing precedent" that it is considered settled law, and that the "legal principle clearly prohibits the officer's conduct in the particular circumstances before him." *D.C. v. Wesby*, 138 S. Ct. 577, 589-90 (2018). Plaintiff has failed to identify any case where an officer, facing similar circumstances as Officer Mordino and applying a minimal amount of force in response, was found to have violated the Fourth Amendment.

24

*Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.* See Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."* **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

DATED:    July 21, 2020
          Buffalo, New York

HONORABLE MICHAEL J. ROEMER
United States Magistrate Judge

25